UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| GREATER CLEVELAND AVENUE | ) | Case No. 18-50410 |
| CHRISTIAN CHURCH | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## <u>OBJECTION BY APEX BANK TO MOTION BY DEBTOR TO MODIFY PLAN</u>

COMES NOW Apex Bank, through counsel, and objects to the Motion to Modify Plan [DOC #192] (the "Motion to Modify") filed by the above-captioned debtor (the "Debtor") on May 1, 2019, and in support thereof, shows the Court as follows:

1.     The Debtor filed for relief under Chapter 11 of the Bankruptcy Code on April 19, 2018.

2.     The Debtor owns and operates a church at 5095 Lansing Drive, Winston-Salem, North Carolina (the "Church Property").

3.     Apex Bank is the largest creditor in this case, holding a secured claim against the bankruptcy estate in the amount of $3,300,299.35.  Said claim is secured by the Church Property.  As of May 17, 2019, the payoff amount of said claim was approximately $3,490,690.43, not including attorneys' fees.

4.     The Debtor's Chapter 11 plan of reorganization (the "Plan") was confirmed by an Order of this Court entered on February 22, 2019 [DOC# 158].  Apex Bank cast a ballot in favor of the Plan after reaching agreed-upon terms with the Debtor as to the treatment of Apex Bank's claim.

5.     Pursuant to the terms of the Debtor's confirmed Plan, on or before the Effective Date of the Plan – March 9, 2019 -- the Debtor was required to tender to Apex

Bank a deed in lieu of foreclosure, transferring clear, fee simple title to the Church Property to Apex Bank. In order to afford the Debtor an opportunity to refinance the secured debt of Apex Bank, the Plan required Apex Bank to hold the deed in lieu in trust and to not record the same prior to March 31, 2019. The Plan additionally required the Debtor to vacate the Church Property on or before April 30, 2019 and to leave the property in a "broom cleaned" condition. Per the terms of the Plan, Apex Bank was entitled to reject the delivery and tender of the deed in lieu and, instead, foreclose it deed of trust against the Church Property, provided that no foreclosure sale was held prior to April 20, 2019. Lastly, the Plan required the Debtor to tender title and possession to all of its equipment and furniture to Apex Bank on or before April 30, 2019.

6.      In contravention of the express terms of the Plan, the Debtor has failed and refused (i) to tender a fully executed deed in lieu of foreclosure to Apex Bank; and (ii) to tender possession of the Church Property to Apex Bank.

7.      Despite its willful failure to comply with the agreed-upon treatment of Apex Bank's claim, the Debtor has complied with the plan terms for other classes, including payment of the Class IX claim of DeLage Financial Services.

8.      Pursuant to the terms of the confirmed Plan, Apex Bank is now in the process of foreclosing the Church Property, with a foreclosure sale scheduled for May 24, 2019.

9.      The Debtor filed its Motion to Modify on May 1, 2019.

10.     In the Motion to Modify, the Debtor requests that the Plan be modified such that the Debtor no longer be required to deliver title and possession of the Church Property (as well as Debtor's equipment and furnishings) to Apex Bank, or that Apex Bank be entitled to foreclose the Church Property, and, instead, that the Debtor be entitled to retain

ownership of the Church Property and be permitted to term-out the secured indebtedness of Apex Bank. As outlined in the Motion to Modify, the alleged rationale for such proposed modification is that the Debtor "has obtained an additional source of revenue by leasing space to Blue Green Academy beginning August 2019" at an alleged monthly rental amount of between $10,000 and $15,000 per month. As additional rationale for the proposed Plan modification, the Debtor writes: "The confirmed Plan's treatment of general unsecured creditors was based on the belief that, should the Debtor be required to vacate the Property, it would nonetheless be able to pay all creditors in full from its continued operations at another location. The Debtor no longer believes that to be the case, understanding now that only by continuing to hold services in its current facility will [sic] be able to pay its unsecured creditors in full."

11.     Upon information and belief, the Debtor does not have a lease with Blue Green Academy, and the Academy has obtained space for its needs in property that does not belong to the Debtor.

12.     Section 1127(b) of the Bankruptcy Code governs a debtor's ability to modify a plan post-confirmation and pre-substantial consummation. That Code Section provides as follows:

> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan <u>only if circumstances warrant</u> such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

(emphasis added).

13.     Here the circumstances do not warrant the proposed Plan Modification. The Debtor is the proponent of the Plan.  The Plan is the direct result of long-winded negotiations between the Debtor and creditors, including Apex Bank.   All impaired classes of creditors, including Apex Bank, voted in favor of the Plan.

14.     Nothing has transpired that renders the Debtor incapable of complying with the terms of the existing confirmed Plan.  The Debtor simply desires not to comply with the Plan.  The statement by the Debtor that it "no longer believes" that it will be able to comply with the terms of the Plan if it is required to vacate the Church Property is deplorable.  In its Amended Disclosure Statement filed on December 31, 2018, the Debtor maintained that even if it was required to locate/rent a new church facility, it would have sufficient funds to pay creditors under the Plan.  Exhibit B-2 to the Amended Disclosure Statement contains projections that support that proposition.  At the hearing to confirm the Plan held before this Court on February 19, 2019, Bishop McCarter testified that the Debtor had the financial ability to meet the projections contained in the Amended Disclosure Statement and that even if the Debtor were required to relocate its operations to a different facility, the Debtor would be able to pay all creditors in full.  Indeed, absent such averments and testimony, the Plan would necessarily have been deemed infeasible and unconfirmable.  In fact, the Order confirming the Plan specifically found that the Plan was feasible.

15.     Despite such projections and testimony, now, at the midnight hour, the Debtor is changing its tune, contending that if the Debtor is forced to vacate the Church Property, its reorganization, is doomed – presumably because many of the Debtor's parishioners, on which the Debtor relies for tithes, will not follow the Debtor to a new location.  In essence, the Debtor now suggests that the projections in its Disclosure

Statement are unsupportable and that Bishop McCarter effectively perjured himself when he testified as to the feasibility of the Plan at the confirmation hearing on February 19, 2019.[1]

16.     The doctrine of judicial estoppel does not countenance changes of heart of this sort. Judicial estoppel is an equitable doctrine designed to protect the integrity of the judicial system by prohibiting litigants from taking inconsistent positions in litigation according to the exigencies of the situation. The Fourth Circuit requires four elements to be met before a court applies judicial estoppel: (1) the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation; (2) the position sought to be estopped must be one of fact rather than law or legal theory; (3) the prior inconsistent position must have been accepted by the court; and (4) the party sought to be estopped must have intentionally mislead the court to gain an unfair advantage. Lowery v. Stovall, 92 F.3d 219, 224 (4th Cir. 1996).

---

[1] The suggestion in the Motion to Modify that the Debtor "believed" as late as the confirmation hearing on February 19, 2019 that it would be able to pay its creditors even if required to vacate the Church Property and now, only 10 weeks later, the Debtor no longer believes that to be true, is absurd. At the confirmation hearing on the confirmed Plan, Bishop McCarter testified that as of February 19, 2019, the projections contained in the Amended Disclosure Statement were "true and accurate" and that those projections were "realistic." At a hearing before this Court on April 30, 2018, (new) counsel for the Debtor stated that if called to testify, Bishop McCarter would testify that if the Debtor is required to vacate the Church property, the Sunday congregation would be reduced from 800 or 900 to 300 – "at best." Counsel additionally stated that "it is one thing for a 125-year-old church to slowly and with a lot of prayer and communication with its congregants to move buildings. But for it to be done under the color of darkness, with a man from the Bank in the back with the keys, would be absolutely debilitating to the church." Based on counsel's statements in this regard, it would appear that the Debtor's congregation is completely oblivious as to the Debtor's bankruptcy and the terms of the Debtor's confirmed Plan. The Debtor and its congregation have had months to "pray and communicate" about finding a new church in which to worship. Apparently, those prayers and communication did not take place because Bishop McCarter and the other church leaders did not inform the congregation about the bankruptcy and/or the terms of the confirmed Plan. If the Debtor is required to vacate "under the color of darkness," the blame for such lies squarely on the shoulders of Bishop McCarter and the other church leaders. The Debtor should not be heard to complain about vacating under the "color of darkness" when it is Bishop McCarter and the other church leaders who have not been forthcoming with their congregation and have intentionally shrouded their parishioners in darkness. Having intentionally determined not to advise its parishioners of the bankruptcy filing or the terms of the confirmed Plan, , the Debtor should not be heard to complain about the inevitable consequences of such deceit – consequences that were equally recognizable on February 19, 2019 (and before) as they are today.

17.     All of the elements for judicial estoppel are extant in this case.  At its confirmation hearing, the Debtor maintained that it could pay creditors under the Plan even if was required to find a new church in which to conduct its business.  The Debtor maintains the opposite in its Motion to Modify.  This position is one of fact.  The Debtor's prior position in this regard was accepted by the Court in its finding in the Confirmation Order that the Plan was feasible and not likely to be followed by the need for further financial reorganization.  The Debtor intentionally mislead the Court in this regard in order to obtain the benefit/advantage of a confirmed plan.  As stated above, absent the Debtor's projections in its Disclosure Statement and Bishop McCarter's testimony that the Debtor could afford its debt service under the Plan, including the contingency that it be required to find a new church in order to conduct its business, this Court could not have determined that the Plan was feasible and, concomitantly, confirm the same.  As such, the doctrine of judicial estoppel precludes the Debtor from now maintaining that requiring the Debtor to vacate the Church Property will foil its reorganizational efforts.

18.     The Debtor has also failed to demonstrate that the proposed modification would comply with the provisions of Section 1129 of the Code.  The actions of the Debtor and the contents of the proposed modification fail to meet any standard of good faith.  In addition, even if the lease referenced in the Motion to Modify existed (which it does not), the Debtor has demonstrated that it does not have the ability to afford the debt service on the secured claim of Apex Bank and thus avoid the inevitable future liquidation of the Church Property.

19.     In fact, the Office of the Bankruptcy Administrator noted in its report that it was unclear whether the Debtor could make a monthly payment of $22,000.  In fact,

three of the last five Operating Reports filed by the Debtor have demonstrated losses for the month, including a loss of $33,965.09 for September 2018.

20.      Based on the above, the circumstances do not warrant the modification of the confirmed Plan as proposed by the Debtor.

21.      Parties in interest are entitled to rely on confirmed plans.  Section 1127 does allow a debtor or plan proponent to modify a confirmed plan (prior to substantial consummation), but that Code Section does not allow a debtor or plan proponent to postulate an <u>entirely new plan</u> out of whole cloth.

22.      Plan modifications that create entirely new plans are impermissible under Section 1127(b).  <u>Legend Radio Group, Inc.</u>, 248 BR. 281 (W.D. Va. 199) *aff'd* 211 F.3d 1265 (4th Cir. 2000) (unpublished).  In <u>Legend Radio</u>, a bankruptcy court confirmed a Chapter 11 plan that required the debtor to sell a radio station.  After confirmation, the debtor filed a motion to modify the confirmed plan.  The proposed modification called for a loan by a third party to the debtor that would allow the debtor to pay off its debts and continue ownership and operation of the radio station.  Rejecting the debtor's motion to modify, the District Court determined that "an implicit requirement" under Section 1127(b) is that "the proposed modification actually be a modification, and not an entirely new plan."  <u>Id</u>. at 285.  On appeal, in an unpublished decision, the Fourth Circuit affirmed the decision of the District Court.  The Fourth Circuit explained:

> The [modified plan] is clearly a new plan and not merely a modification of
>
> the [confirmed plan]. . . .  The stark contrast between these two plans
>
> convinces the court that the [modified plan], rather than modifying a
>
> portion or portions of the [confirmed plan], has instead wiped the slate
>
> clean and developed an entirely new plan, which retains none of the key

elements of the confirmed plan. . . . The two plans are not compatible.

Accordingly, we hold that the changes proposed by [the debtor] to the

[confirmed plan] are not within the realm of modifications contemplated

by § 1127(b).

Legend Radio, 211 F.3d at *6.[2]

23.     Here, as in Legend Radio, the proposed modified plan wipes the slate clean.
The confirmed Plan required the Debtor to either refinance Apex Bank's debt prior to March
30, 2019 or tender to Apex Bank a deed in lieu of foreclosure.  The confirmed Plan also
allowed Apex Bank to foreclose the Church Property if a refinance was not consummated
prior to March 30, 2019.  Contrariwise, instead of mandating a refinance of Apex Bank's
debt or the surrender of the Church Property to Apex Bank, the proposed modified plan
allows the Debtor to retain the Church Property and to term-out Apex Bank's secured claim.
The proposed modified plan wipes the slate clean and is incompatible with the confirmed
Plan.

24.     As articulated by the District Court and the Fourth Circuit in Legend Radio,
Section 1127(b) contemplates "modifications" of confirmed plans, not wholescale "do-
overs."  The proposed plan modification in this case is a wholescale, slate-cleaning do-over
and is not permissible under Section 1127(b).

WHEREFORE, for the reasons outlined herein, Apex Bank requests that this Court
deny the Debtor's Motion to Modify and that the Court grant Apex Bank such other and
further relief as this Court deems just and proper.

---

[2] Copies of the District Court and Fourth Circuit Legend Radio decisions are attached hereto, collectively,
as **Exhibit A.**

Respectfully submitted, this the 17th day of May, 2019.

/s/ Daniel C. Bruton
DANIEL C. BRUTON
State Bar No. 22440
*Attorney for Apex Bank*
BELL, DAVIS & PITT, P.A.
P. O. Box 21029
Winston-Salem, NC 27120-1029
(336) 722-3700
dbruton@belldavispitt.com

In re Legend Radio Group, Inc., 248 B.R. 281 (1999)

248 B.R. 281
United States District Court,
W.D. Virginia,
Abingdon Division.

In re LEGEND RADIO GROUP, INC., Debtor.

Civ.A. Nos. 97–0165–A, 98–
0192–A, and 98–0195–A.
|
April 8, 1999.

**Synopsis**
Proponent sought confirmation of plan providing for sale of radio station owned and operated by Chapter 11 debtor. The Bankruptcy Court confirmed plan. Appeal was taken. The District Court affirmed, and debtor appealed. After briefing was suspended on appeal, debtor moved to modify confirmed plan. Finding that Court of Appeals had authorized it to entertain motion, the Bankruptcy Court ordered filing of any additional or modified plans. Intended buyer sought interlocutory appeal, which was granted, and moved to implement confirmed plan. In addition, debtor sought order staying enforcement of confirmation order pending appeal to Court of Appeals. Following withdrawal of the reference, the District Court, Williams, Senior District Judge, held that: (1) Court of Appeals returned jurisdiction to consider motion to modify confirmed plan to bankruptcy court; (2) confirmed plan could not be modified to reflect plan under which debtor retained ownership and operation of radio station; (3) debtor was not entitled to stay pending appeal of order affirming confirmation of plan; and (4) order compelling debtor to take substantial steps to comply with confirmed plan was warranted.

Ordered accordingly.

West Headnotes (10)

[1]     **Bankruptcy**
        👈 Conclusions of law;de novo review
        **Bankruptcy**
        👈 Clear error
        In reviewing the decision of the bankruptcy court, district court uses two standards of review: the court reviews all factual findings of the bankruptcy court under the clear error standard, and de novo review is exercised as to matters of law.

        Cases that cite this headnote

[2]     **Bankruptcy**
        👈 Effect of Transfer
        Although bankruptcy court was stripped of jurisdiction over matters related to confirmed Chapter 11 plan providing for sale of debtor's radio station when appeal was taken to district court from confirmation order, jurisdiction to consider motion to modify confirmed plan was returned to bankruptcy court when Court of Appeals granted debtor's motion to suspend briefing schedule on further appeal of confirmation order and required debtor to file monthly reports on status of motion to modify, given that Court of Appeals would not encourage bringing of motion before court lacking jurisdiction.

        Cases that cite this headnote

[3]     **Bankruptcy**
        👈 Effect of Transfer
        Filing of a notice of appeal divests the trial court of jurisdiction over matters involved in the appeal, and confers jurisdiction in the appellate court.

        Cases that cite this headnote

[4]     **Bankruptcy**
        👈 Effect of Transfer
        Rule that filing of notice of appeal divests trial court of jurisdiction over matters involved in appeal, and confers jurisdiction in appellate court, applies with equal force to bankruptcy cases.

        Cases that cite this headnote

[5]     **Bankruptcy**
        👈 Modification or revocation



EXHIBIT

A

Confirmed Chapter 11 plan providing for sale of debtor's radio station and other assets could not be modified to reflect plan under which debtor would retain ownership and operation of station, inasmuch as proposed modification effected substitution of confirmed plan with entirely new plan that retained none of key elements of confirmed plan. Bankr.Code, 11 U.S.C.A. § 1127(b).

Cases that cite this headnote

[6] **Bankruptcy**
☞ Modification or revocation

Chapter 11 debtor bore the burden of establishing that all the requirements of statute governing modification of confirmed plans were met. Bankr.Code, 11 U.S.C.A. § 1127(b).

Cases that cite this headnote

[7] **Bankruptcy**
☞ Modification or revocation

Implicit requirement for modification of confirmed plan is that the proposed modification actually be a modification, and not an entirely new plan. Bankr.Code, 11 U.S.C.A. § 1127.

Cases that cite this headnote

[8] **Bankruptcy**
☞ Right;grant or denial;discretion

Chapter 11 debtor was not entitled to stay pending appeal of order affirming confirmation of plan providing for sale of debtor's radio station, given that purchaser would be harmed if stay issued by continuing to be deprived of opportunity to begin operating station and attempting to profit from such operation.

Cases that cite this headnote

[9] **Bankruptcy**
☞ Right;grant or denial;discretion

A party seeking a stay pending appeal must show (1) that it will likely prevail upon the merits of the appeal, (2) that it will suffer irreparable harm if the motion for a stay is denied, (3) that other parties will not be harmed by the stay, and (4) that granting a stay will serve the public interest.

Cases that cite this headnote

[10] **Bankruptcy**
☞ Construction, execution, and performance

Order compelling Chapter 11 debtor immediately to take substantial steps to comply with confirmed plan, including execution and delivery of all necessary documents relating to sale of debtor's radio station and other assets and filing of appropriate documents with Federal Communications Commission (FCC) so that it could evaluate sale, was warranted when plan was confirmed by bankruptcy court more than 18 months earlier and affirmed by district court, debtor had taken no action to implement plan, which was on appeal to Court of Appeals, and lengthy delay had already resulted in much of debtor's estate being consumed by attorney fees and costs and future delays would likely have same effect. Bankr.Code, 11 U.S.C.A. § 1142.

1 Cases that cite this headnote

**Attorneys and Law Firms**

*283 Patrick L. Hayden, Norfolk, VA, for plaintiff.

John M. Lamie, Abingdon, VA, for Legend.

Robert T. Copeland, Rebecca K. Glenberg, Richmond, VA, for Rita and Craig Sutherland.

Robert T. Copeland, Abingdon, VA, for Sutherlands.

Mark L. Esposito, Bristol, VA, for Edwards.

David J. Hutton, Abingdon, VA, for Southern Communications.

Margaret Garber, Roanoke, VA, for U.S. Trustee.

### *MEMORANDUM OPINION*

WILLIAMS, Senior District Judge.

I. Introduction

All of the cases whose civil action numbers are listed above involve the same debtor and all revolve around the same issue, namely the status of a bankruptcy plan confirmed by Debtor's creditors and approved by this court on April 14, 1998. Thus, the court will proceed to decide several pending motions from the cases in this Memorandum Opinion.

II. Facts of the Cases

Debtor owns and operates a radio station in the Bristol–Abingdon, Virginia area. It filed a voluntary petition for Chapter 11 bankruptcy on June 28, 1994. On August 25, 1994, the Bankruptcy Court ordered the Debtor, acting as a debtor-in-possession, to make monthly adequate protection payments in the amount of $1,500.00 to Southern Communications, Inc., one of Debtor's several creditors. While many of the monthly payments have been made, Debtor has failed to make payments for a total of 21 months (as of February 1999), and thus owes Southern Communications a sum of $31,500.00 for past-due adequate protection payments. After rejection of a reorganization plan proposed by the Debtor, another plan proposed by Debtor and one proposed by Richard Edwards were heard by the Bankruptcy Court on October 1, 1996. Edwards is another of Debtor's creditors. Both plans were subsequently modified, and Edwards' modified plan (hereinafter, "Edwards' plan") providing for the sale of the radio station and other of Debtor's assets to Bristol Broadcasting Company, Inc. for $335,000.00 was confirmed by the Bankruptcy Court on September 5, 1997. The money was paid into an interest-bearing escrow account. On April 14, 1998, this court entered an Order affirming the Bankruptcy Court's confirmation of Edwards' plan. Debtor appealed that decision to the Fourth Circuit Court of Appeals. No Order to stay the judgment of this court was entered.

The Fourth Circuit, upon motion of the Debtor, suspended the briefing schedule in that court. On July 2, 1998, Debtor returned to Bankruptcy Court with a Motion to Modify the confirmed plan. The proposed modification called for Don Nicewonder to loan $425,000.00 to the Debtor to allow it to pay off its debts and continue ownership and operation of its radio station (hereinafter, "Nicewonder plan"). That sum of money was also placed into an interest-bearing escrow account. The Bankruptcy Court entered an Order on October 7, 1998, finding that the Fourth Circuit had, in effect, authorized the Bankruptcy Court to entertain a Motion to Modify the confirmed plan. Accordingly, the Bankruptcy Court ordered that any additional or modified plans, accompanied by a disclosure statement, were to be filed within 60 days of the Bankruptcy Court's Order.

The first matter the court will address arises from this Order of the Bankruptcy Court. Bristol Broadcasting requested, and was granted, an interlocutory appeal **\*284** to this court.[1] Second, Debtor has requested that this court enter an Order staying enforcement of this court's April 14, 1998 confirmation Order pending appeal of this case to the Fourth Circuit. Southern Communications' Motion for Approval of Administrative Expense is also pending before the court. Finally, Bristol Broadcasting's Motion to Implement the Confirmed Plan is before this court.

III. Appeal from the Bankruptcy Court's Order

A. Standard of Review

[1]   In reviewing the decision of the Bankruptcy Court, this court uses two standards of review. The court reviews all factual findings of the Bankruptcy Court under the "clear error" standard. *De novo* review is exercised as to matters of law.   *In re Bullion Hollow Enterprises, Inc.,* 185 B.R. 726 (W.D.Va.1995) (citing *In re Midway Partners,* 995 F.2d 490, 493 (4th Cir.1993)).

B. Legal Discussion

[2]   The Bankruptcy Court clearly stated that its Order only determined the question of whether the Bankruptcy Court had jurisdiction to entertain the Motion to Modify the confirmed plan pending appeal of the plan to the Fourth Circuit Court of Appeals. Therefore, the only issue on appeal is whether the jurisdiction does indeed exist, given the facts of this case.

[3]  [4]  It is well-settled that the filing of a notice of appeal divests the trial court of jurisdiction over matters involved in the appeal, and confers jurisdiction in the appellate court. *Marrese v. Am. Academy of Orthopaedic Surgeons,* 470 U.S. 373, 379, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58–59, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982). This rule applies with equal force to bankruptcy cases. *In re Commodore,* 86 B.R. 564, 567 (N.D.Ind.1988); *In re Borg,* 92 B.R. 475, 476–77 (Bankr.D.Mont.1988). Thus, the bankruptcy court retains jurisdiction over matters which are not affected by the issues on appeal. *Commodore,* 86 B.R. at 567. When the Bankruptcy Court's September 5, 1997 Order was appealed to this court, the Bankruptcy Court lost jurisdiction over any matter which was affected by the issues on appeal to this court.

Before the Bankruptcy Court was a proposal to substitute one plan calling for Debtors to remain in control of the radio station for a previously confirmed plan calling for Debtors to sell the station. It is obvious that only one of the two plans can be given effect. Therefore, this court holds that the two plans are inextricably linked to one another, and that the Nicewonder plan thus involves a matter which is substantially affected by the issue currently on appeal to the Fourth Circuit, namely the confirmation of Edwards' plan. *See In re Southold Development Corp.,* 129 B.R. 18, 21 (E.D.N.Y.1991) (noting that the bankruptcy court is divested of jurisdiction over "matters undeniably related to issues on appeal").

Having determined that the Bankruptcy Court was thus stripped of any jurisdiction over the Nicewonder plan at the instant the Debtor filed its notice of appeal to this court on September 15, 1997, the court must now determine whether the Bankruptcy Court was revested with jurisdiction over the plan. Debtor contends that the Fourth Circuit's Order staying the briefing schedule in the appeal has authorized the Bankruptcy Court to hear the Motion for Modification. The court has examined both the Motion which Debtor made to the Fourth Circuit in which Debtor requested the stay of the briefing schedule, as well as the Order entered by the Fourth Circuit.

The Circuit Court's Order granted "appellant's motion to suspend the briefing **\*285** schedule." Appellant Legend Radio was additionally ordered to file monthly status reports "on the status of the motion to modify the plan." Thus, it is obvious that the Fourth Circuit understood that Debtor's Motion was for the purpose of allowing it to bring a Motion for Modification before the Bankruptcy Court. Although the Fourth Circuit did not explicitly state that jurisdiction was being returned to the Bankruptcy Court, *see In re Tri–L Corp.,* 65 B.R. 774, 778 (Bankr.D.Utah 1986) (noting that express statements of retention of jurisdiction generally allow a court to so retain jurisdiction), by requesting status reports on the Motion, the Circuit Court must have meant for the Bankruptcy Court to consider the Motion. This court does not believe that the Fourth Circuit would allow, and in fact encourage, a Motion to be brought before a lower court which lacked jurisdiction to consider the Motion. Therefore, this court concludes that the Bankruptcy Court was properly vested with jurisdiction to consider the Motion. Because this court has withdrawn the reference of the Bankruptcy Court in this case, the parties' arguments on appeal regarding the propriety of the Motion will be considered by this court *de novo.*

IV. Propriety of Debtor's Motion for Modification under 11 U.S.C. § 1127

[5]  Bristol Broadcasting contends that Debtor's Motion for Modification should be denied because it fails to meet certain requirements of 11 U.S.C. § 1127. Section 1127(b) provides for the modification of plans after confirmation, but only under certain circumstances. Bristol Broadcasting, in its brief and at oral argument, has set out a variety of requirements which it claims are not met by the Nicewonder plan. However, this court need not address all of the claims because the court finds the first argument made by Bristol Broadcasting conclusive of the matter.

[6]  [7]  The Debtor bears the burden of establishing that all the requirements of 11 U.S.C. § 1127(b) are met. *See In re BNW, Inc.,* 201 B.R. 838, 845 (Bankr.S.D.Ala.1996). These requirements are detailed in 11 U.S.C. §§ 1122, 1223 and 1127(b). Additionally, an implicit requirement is that the proposed modification actually be a modification, and not an entirely new plan. *See Prudence–Bonds Corp. v. City Bank Farmers Trust Co.,* 186 F.2d 525, 528 (2nd Cir.1951) (where Judge Learned Hand wrote that "[t]he court may never under the guise of 'alteration' or 'modification' substitute an

entirely new 'plan' in place of the original."). It is this latter requirement that the court concludes is not met in this instance because the Nicewonder plan is actually an entirely new plan.

The confirmed plan in this case, which was proposed by Edwards, calls for the liquidation of Debtor's key asset —the radio station. By contrast, the Nicewonder plan is a plan of reorganization which would allow Debtor to continue its ownership and operation of the radio station. The stark contrast between these two plans convinces the court that the Nicewonder plan, rather than modifying a portion or portions of the Edwards plan, has instead wiped the slate clean and developed an entirely new plan, which retains none of the key elements of the confirmed plan. Having determined that one of the requirements of § 1127(b) is not met, the court need not inquire as to whether the other requirements of that subsection are satisfied in the instant case. Thus, the court denies Debtor's Motion for Modification of the confirmed plan.

V. Debtor's Motion for Stay Pending Appeal
 [8]   Debtor has moved for a stay pending appeal of this case to the Fourth Circuit. As noted above, no action is currently being taken on the appeal, as the Fourth Circuit has suspended the briefing schedule. Bristol Broadcasting has filed a Memorandum setting forth its objections to this Motion.

**\*286**  [9]   The Fourth Circuit's decision in *Long v. Robinson,* 432 F.2d 977 (4th Cir.1970), guides this court in its consideration of Debtor's Motion. In *Long,* the Fourth Circuit established a four-part test to be applied to Motions for stays pending appeal within the circuit. *Id.,* at 979. A party seeking a stay must show (1) that it will likely prevail upon the merits of the appeal, (2) that it will suffer irreparable harm if the motion for a stay is denied, (3) that other parties will not be harmed by the stay, and (4) that granting a stay will serve the public interest. All four parts of the test must be met before a stay will be issued. *Id.*

Bristol Broadcasting will be harmed if a stay is issued. The court notes initially that Bristol Broadcasting is a party to this case, as it has a definite stake in the confirmed plan as the purchaser of the radio station. Also, the court notes that any harm to a party such as Bristol Broadcasting need not be irreparable. Bristol Broadcasting will be harmed if a stay is issued because it will continue to be deprived

of the opportunity to begin operating a radio station and from attempting to profit from such operation. Having established that at least one of the requisite elements of the test is missing, the court concludes that it would not be proper to grant Debtor's Motion for Stay Pending Appeal, and thus denies Debtor's Motion.

VI. Southern Communications's Motion for Approval of Administrative Expense
Creditor Southern Communications has requested that this court approve monies owed it under an adequate protection payment order as an administrative expense, as defined in 11 U.S.C. § 503(b)(3)(D). Although a hearing on this Motion was noticed for March 1, 1999, the date on which several of these other motions were heard, the court believes that a separate hearing is necessary in order to rule upon this Motion, and thus will not rule on the Motion at this time.

VII. Bristol Broadcasting's Motion to Implement the Confirmed Plan
 [10]   Bristol Broadcasting has requested that Debtor begin to take steps to implement the Edwards plan, which was confirmed by the Bankruptcy Court more than 18 months ago and by this court nearly one year ago. At this time, Debtor has taken no action to begin implementation of the plan, which is now on appeal to the Fourth Circuit. The Bankruptcy Code provides that confirmed plans "shall [be] carr[ied] out" and that "[t]he Court may direct the Debtor ... to effect the transfer of property dealt with by a confirmed plan." 11 U.S.C. § 1142. The already lengthy delay in this case has resulted in much of Debtor's estate being swallowed up by attorneys' fees and costs, and continued delays are likely to continue much of the same. For these reasons, the court orders Debtor to immediately taken substantial steps to comply with the confirmed plan in this case, including, but not limited to, executing and delivering all necessary documents relating to the sale of its assets to Bristol Broadcasting and filing the appropriate documents with the Federal Communications Commission so that it may evaluate this sale.

VIII. Conclusion
An Order stating the court's rulings on all the matters discussed herein shall be entered this same day. The appeal to the Fourth Circuit may now continue. This court believes an expedited appeal should be granted in this case.

In re Legend Radio Group, Inc., 248 B.R. 281 (1999)

It has been stated in oral argument that an additional $31,500.00 in administrative costs has accumulated in this bankruptcy proceeding in the past two years, and the court is concerned that costs and fees may continue to erode Debtor's estate, concluding in a Dickensian result.

The Clerk is directed to send certified copies of this Memorandum Opinion to all counsel of record.

## *287 *ORDER*

For the reasons stated in the Memorandum Opinion entered this date, it is hereby ORDERED that Debtor's Motions for Modification and for a Stay Pending Appeal are DENIED. Debtor is also ORDERED to come into immediate compliance with the August 25, 1994 adequate protection payment Order of the Bankruptcy Court. It is further ORDERED that Debtor shall immediately take substantial steps to comply with the confirmed plan in this case, including, but not limited to, executing and delivering all necessary documents relating to the sale of its assets to Bristol Broadcasting and filing the appropriate documents with the Federal Communications Commission so that it may evaluate this sale.

**All Citations**

248 B.R. 281

## Footnotes

1    This matter also comes before the court pursuant to an Order dated November 19, 1998 which withdrew the reference of the Bankruptcy Court in the case.

---

End of Document                                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

211 F.3d 1265
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. See CTA4 Rule 32.1.
United States Court of Appeals, Fourth Circuit.

LEGEND RADIO GROUP,
INCORPORATED, Debtor-Appellant,
v.
Craig SUTHERLAND; Rita Sutherland;
Richard Edwards; Southern Communications,
Incorporated, Creditors-Appellees;
U.S. TRUSTEE, Trustee-Appellee.
BRISTOL BROADCASTING COMPANY,
INCORPORATED, Plaintiff-Appellee,
v.
LEGEND RADIO GROUP,
INCORPORATED, Debtor-Appellant.
In re LEGEND RADIO GROUP,
INCORPORATED, Debtor.
BRISTOL BROADCASTING COMPANY,
INCORPORATED, Plaintiff-Appellee,
v.
LEGEND RADIO GROUP,
INCORPORATED, Debtor-Appellant.

Nos. 98-1720, 99-1639, 99-1640.
|
Argued Dec. 1, 1999.
|
Decided April 7, 2000.

Appeals from the United States District Court for
the Western District of Virginia, at Abingdon. Glen
M. Williams, Senior District Judge. (CA-97-165-A,
BK-94-1461-7-HPA, CA-98-192-A, CA-98-195-A).

**Attorneys and Law Firms**

John Michel Lamie, Browning & Lamie, P.C., Abingdon,
VA, for appellant.

Patrick Louis Hayden, McGuire, Woods, Battle &
Boothe, L.L.P., Norfolk, VA, for appellees.

ON BRIEF: Robert W. McFarland, Dion W. Hayes,
McGuire, Woods, Battle & Boothe, L.L.P., Norfolk,
VA; Fred M. Leonard, Bristol, TN, for appellee Bristol
Broadcasting; Mark L. Esposito, Penn, Stuart & Eskridge,
Bristol, VA, for appellee Edwards; David J. Hutton,
Boucher, Hutton, Kelly & Graham, P.C., Abingdon, VA,
for appellee Southern Communications.

Before WILLIAMS, MICHAEL, and KING, Circuit
Judges.

OPINION

PER CURIAM.

**\*1** Legend Radio Group, Inc., the debtor in this Chapter
11 bankruptcy proceeding, appeals two rulings of the
district court. The first, memorialized by the district
court's order of April 14, 1998, affirmed the bankruptcy
court's confirmation of a creditor's plan to sell the assets of
the bankruptcy estate. The second, entered approximately
one year later on limited remand from this court, denied
Legend's motion for modification of the confirmed plan.
We conclude that the district court did not err in either
ruling, and we therefore affirm.

I.

A.

Legend owns radio stations WABN-AM and WABN-
FM, both of which broadcast from studios in Abingdon,
Virginia. On June 28, 1994, Legend filed a voluntary
petition for Chapter 11 reorganization, listing just over
$120,000 in assets and about $460,000 in liabilities. The
largest secured creditors were Southern Communications,
Inc. (Southern), the company that had sold the stations to
Legend in 1987, and Dickenson Buchanan (now Premier)
Bank.[1] The amounts owed to Southern and Premier
accounted for more than eighty percent of Legend's total
liabilities.

Among the larger unsecured creditors were Richard
Edwards and his father, Olney, who had formed Legend
in association with Craig and Rita Sutherland. The
Edwardses had conveyed their ownership interest in
the company to the Sutherlands in accordance with a
1992 court settlement. Richard Edwards, however, had

a continuing interest in Legend's ability to operate at a profit. Not only was he an unsecured creditor, but he had also pledged substantial personal assets as collateral for Legend's loan from Premier Bank. In the wake of the bankruptcy petition, Edwards was required to make the loan payments to prevent Premier from seizing the collateral.

Following the bankruptcy court's rejection of Legend's initial plan of reorganization, Edwards submitted his own plan (the "Edwards Plan") providing for the sale of Legend's assets (the radio stations and associated property) to Bristol Broadcasting Co., Inc. ("BBCI") at a price of $335,000. *See* 11 U.S.C. § 1121 (governing the filing of reorganization plans by the debtor and other parties in interest). The bankruptcy court rejected the original Edwards Plan, as well as a modified version of Legend's initial plan (the "Legend Plan"). With respect to the Edwards Plan, the court expressed its concern that Southern and Premier would receive a sum certain in partial satisfaction of their claims, without regard to the actual value of the collateral securing the debt.[2] The bankruptcy court was further concerned that there had been "no objective valuation of the real estate and the business" to assist it in gauging the adequacy of the proposed sale price.

Thereafter, Edwards amended his plan slightly and resubmitted it. The only substantive change related to the treatment of Premier, which had previously been slated to receive a flat $75,000 for the secured portion of its claim. Under the amended plan, the bankruptcy court would instead decide the amount of Premier's secured claim; if the debt to Premier exceeded the value of Legend's collateral as determined by the court, Premier would have an unsecured claim for the balance.

**\*2** On March 18, 1997, the bankruptcy court conducted a confirmation hearing on the Edwards Plan, as amended. During this proceeding, the court heard the testimony of George I. Otwell, the managing director of a national media brokerage firm. Otwell's firm, at the behest of Edwards, had prepared a valuation analysis of WABN-AM and WABN-FM. Otwell testified that the fair market value of the radio stations was $275,000, considerably less than the $335,000 already offered by BBCI and placed in escrow. At this same hearing, however, counsel for Legend represented that another broker, retained by the Sutherlands, had recently appraised the stations at

$690,000. On the strength of that valuation, Legend had been working with the Small Business Administration ("SBA") to obtain a bank loan of sufficient size to permit the stations to become current with their creditors. Confronted with this new development, the court continued the confirmation hearing and permitted Legend to further modify and resubmit its plan.

On May 27, 1997, the proceedings resumed with the latest versions of the Edwards Plan and the Legend Plan both before the bankruptcy court for confirmation. The court heard the testimony of Charles A. Dick, the Sutherlands' expert, in support of his $690,000 appraisal. One basis for his valuation, Dick explained, was the ever-increasing demand for the limited number of available broadcasting licenses, the vast majority of which are obtained by the sale of existing stations. A second basis, according to Dick, was that a broadcaster's "area of influence" extends beyond that covered by its primary signal, due in large part to the mobility of the listening audience. A significant portion of the population, for example, commutes a considerable distance between home and work, either of which might be within the signal range. Under this analysis, the area of influence for WABN-AM and WABN-FM extends at least thirty miles beyond the effective reach of the stations' signals, encompassing the lucrative Tri-Cities market of northeastern Tennessee. Other factors entered into Dick's valuation calculus, including Legend's ownership of the real estate on which its studios and broadcast tower are situated. Legend had been deriving income from its tower by leasing antenna and transmitter space to providers of cellular telephone and paging services. On cross-examination, Dick admitted that his appraisal was heavily influenced by the stations' potential as a profitable enterprise-a potential that in his opinion had not been fully realized:

> Q. Your opinion as to the $690,000 figure ... does not address what the value of this station is today, the way it is being run today by existing management ... ?

> A. On the cash flow basis, you are 100 percent right.

The bankruptcy court rejected the Legend Plan, concluding that it proposed payments to the estate's creditors over an unduly protracted period (more than eleven years) and that it offered little chance of success in any event. The court noted further that insofar as the Legend Plan permitted the Sutherlands to retain an equity interest in the business while payment of the unsecured

Legend Radio Group, Inc. v. Sutherland, 211 F.3d 1265 (2000)

claims languished, the plan violated the "absolute priority rule."[3] The Edwards Plan, by contrast, would divest the Sutherlands of their ownership rights and provide for the prompt disbursement of the $335,000 generated by the sale of the business to BBCI. The proceeds would infuse significantly more cash into the estate than the maximum new debt of $200,000 that the SBA would guarantee under the Legend Plan. This latter fact had apparently not been lost on the creditors, each class of which voted in favor of the Edwards Plan. The bankruptcy court found the Edwards Plan to meet all of the statutory requirements for confirmation. *See* 11 U.S.C. § 1129. Accordingly, on September 5, 1997, the court entered an order confirming that plan.

**B.**

*3 Legend appealed the bankruptcy court's order confirming the Edwards Plan to the district court, which affirmed the bankruptcy court on April 14, 1998. Legend then filed a timely notice of appeal to this court, which was docketed as No. 98-1720. Shortly thereafter, we ordered a limited remand for the bankruptcy court to permit Legend to file a motion to modify the Edwards Plan, pursuant to 11 U.S.C. § 1127(b). The proposed "modification" was an offer from investor Don Nicewonder (the "Nicewonder Plan") to (1) obtain a one-third interest in Legend for $142,000 and (2) loan the company an additional $283,000 to pay off the balance on its old debts.

On October 7, 1998, the bankruptcy court ordered Legend to file a disclosure statement with respect to the Nicewonder Plan, *see* 11 U.S.C. § 1125(b), and ordered that any party wishing to submit additional modifications (or a new plan) must do so within sixty days. BBCI appealed the October 7 order and then moved the district court to withdraw its reference of the case to the bankruptcy court. *See* 28 U.S.C. § 157(d). The district court granted BBCI's motion (and withdrew the reference) on November 19, 1998.

On April 8, 1999, the district court entered an order denying Legend's motion for modification, concluding that the Nicewonder Plan did not "modify" the Edwards Plan because it was actually an entirely new plan. Absent some identity between the two plans, the court reasoned, the Edwards Plan was not subject to alteration under § 1127(b). Legend now appeals the district court's orders (1) affirming the bankruptcy court's confirmation of the

Edwards Plan and (2) denying Legend's motion to modify the confirmed Edwards Plan by adding the Nicewonder Plan.

**II.**

In reviewing the district court's decision to affirm the bankruptcy court's confirmation order, we apply the same level of scrutiny as did the district court. We must accept the facts as found by the bankruptcy court unless we discover those findings to be clearly erroneous. *In re Stanley,* 66 F.3d 664, 667 (4th Cir.1995) (citation omitted). The bankruptcy court's application of the law, however, is owed no deference, and is therefore reviewed de novo. *Id.* Likewise, inasmuch as the district court's denial of Legend's motion for modification rests, in this case, on that court's interpretation of the law, we review that decision de novo.

**A.**

Legend first challenges the confirmation of the Edwards Plan. For us to reverse on this issue, we would have to conclude that the bankruptcy court clearly erred in finding that BBCI's offer of $335,000 for Legend's assets was fair and reasonable. We do not find clear error.

The evidence before the bankruptcy court as to the value of the radio stations consisted entirely of the conflicting testimony of the two valuation experts-Otwell, who supported the Edwards Plan, and Dick, who testified for the Sutherlands (and Legend). Otwell's qualifications were extensively documented. He had about thirty years of experience in the radio industry, having personally brokered more than two hundred sales of radio stations. In the course of his business and "on a regular basis," Otwell had appraised radio stations "of all sizes." Dick was similarly well qualified.

*4 Otwell's appraisal of WABN-AM and WABN-FM at $275,000 was based on his comprehensive review of the stations' financial reports, tax returns, schedule of assets, licensing restrictions, effective area of broadcast, and market share as measured by several years of Arbitron ratings. In contrast, Dick's $690,000 valuation de-emphasized many of these same factors, relying instead on the stations' hypothetical performance under optimal management.

In confirming the Edwards Plan, the bankruptcy court accepted Otwell's valuation. That decision was consistent with the realities and the evidence. BBCI's offer of $335,000, which is considerably more in line with Otwell's valuation than with Dick's, was on the table months before either appraisal was commissioned. Moreover, as the bankruptcy court noted, "[n]o upset bids[were] filed against the $335,000 [BBCI] bid incorporated in the Edwards Plan despite the fact that this offer and Plan ha[d] been pending before [the] Court for many months." In other words, the absence of a competing bid over that time is an indication of the fairness of the BBCI bid. Furthermore, Nicewonder's proposal (which came much later) to pay $142,000 for a one-third interest in Legend is neither a ringing endorsement of Dick's appraisal nor a condemnation of Otwell's. Even if we assumed that full ownership of the company is worth three times Nicewonder's offer (which, for a variety of reasons, we do not), the extrapolated value of $426,000 is still closer to Otwell's projections than to Dick's and closer still to BBCI's actual bid of $335,000. Under these circumstances, where the bankruptcy court was presented with the valuations of two experts, we cannot say that it committed clear error by adopting the one significantly closer to the only concrete offer of purchase received over the course of nine months. We therefore affirm the district court's order upholding the bankruptcy court's confirmation of the Edwards Plan.

B.

We turn now to the district court's denial of Legend's motion for modification of the Edwards Plan, a procedure governed by Section 1127 of the Bankruptcy Code. That section provides, in pertinent part:

> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan.... Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified....

11 U.S.C. 1127(b). [4] The parties dispute whether Legend is a "reorganized debtor" with standing to modify a confirmed plan and whether the Edwards Plan has undergone "substantial consummation," thereby precluding it from being materially altered. [5] We need not decide either question, however, because we agree with the district court that the Nicewonder Plan would "modify" the Edwards Plan out of existence, an outcome that we conclude is forbidden by the Bankruptcy Code.

**\*5** Under the old Bankruptcy Act, which preceded the current Code, the changes proposed by the Nicewonder Plan would not have been accepted as a modification of the Edwards Plan. *See Matters of Inland Gas Corp.,* 275 F.2d 509, 513 (6th Cir.1960) ("We think the district judge ... used sound common-sense, practical judgment in declining to permit an altogether new plan to be submitted, under the guise of alterations and modifications, in lieu of a sound plan already confirmed by him...."). In reaching its conclusion, the Sixth Circuit quoted Judge Learned Hand:

> [T]he court may never under the guise of "alteration" or "modification" substitute an entirely new"plan" in place of the original[,] although what is the line between a substitute and an "alteration" or a "modification" is necessarily left at large.... [I]t is often exceedingly difficult for a bankruptcy court to resist the importunities ... of those who wish to keep the "revived debtor" indefinitely beneath its aegis.... We can do no more than declare, for whatever weight it may have, that we deem the long delay which so often occurs between the order of "confirmation" and the "final order" a major abuse, and that a judge who superintends such a proceeding should feel himself charged with an affirmative duty to insist upon its early conclusion.

*Inland Gas*, 275 F.2d at 513-14 (quoting *Prudence-Bonds Corp. v. City Bank Farmers Trust Co.*, 186 F.2d 525, 528 (2d Cir.1951)).

*Inland Gas* interpreted Section 222 of the old Bankruptcy Act, which, in conjunction with Section 229(c), was the forerunner of the statute at issue here, 11 U.S.C. § 1127(b). [6] As we have previously noted, prior practice under the Act is accorded "significant weight" when construing ambiguities in parallel provisions of the Bankruptcy Code.  *In re Merry-Go-Round Enters., Inc.*, 180 F.3d 149, 156 (4th Cir.1999) (citing  *Dewsnup v. Timm*, 502 U.S. 410 (1992)).

The Nicewonder Plan is clearly a new plan and not merely a modification of the Edwards Plan. The Edwards Plan divests the Sutherlands of their ownership interest in Legend and provides for the sale of the company's assets to satisfy its creditors. The Nicewonder Plan would permit the Sutherlands to retain control of the radio stations while infusing new money into the existing corporate structure. As the district court concluded:

> The confirmed plan in this case, which was proposed by Edwards, calls for the liquidation of Debtor's key asset-the radio station. By contrast, the Nicewonder plan is a plan of reorganization which would allow Debtor to continue its ownership and operation of the radio station. The stark contrast between these two plans convinces the court that the Nicewonder plan, rather than modifying a portion or portions of the Edwards plan, has instead wiped the slate clean and developed an entirely new plan, which retains none of the key elements of the confirmed plan.

The two plans are not compatible. Accordingly, we hold that the changes proposed by Legend (through the Nicewonder Plan) to the Edwards Plan are not within the realm of modifications contemplated by § 1127(b). The district court did not err, therefore, in denying Legend's motion for modification. The Edwards Plan is a fair and reasonable plan already confirmed, and we feel "charged with an affirmative duty to insist upon its early conclusion."

**\*6** The district court's orders on appeal are affirmed.

*AFFIRMED.*

**All Citations**

211 F.3d 1265 (Table), 2000 WL 359740

Footnotes

1    Southern had a first deed of trust against Legend's real estate, and Premier's loan was secured by a lien against all of Legend's equipment.

2    The Edwards Plan, as originally submitted, stipulated that Southern's secured claim would be paid "to the extent of the value of its collateral, ($150,000)." The plan made no similar representations concerning the value of the equipment securing Legend's debt to Premier, *see supra* note 1, but it nonetheless provided for the payment of $75,000 to extinguish the secured portion of Premier's claim. Both of these creditors were acknowledged to be "impaired" under the plan, *see* 11 U.S.C. § 1123(a)(3), which meant that any debt determined to be owing beyond the above-mentioned amounts would be treated as an ordinary unsecured claim, for which Southern and Premier would not receive full remuneration.
    The bankruptcy court criticized the Edwards Plan as "propos[ing] grossly disparate treatment among unsecured creditors." In other words, the plan did not account for the possibility that the value of the collateral securing the loans from Southern and Premier might turn out to be *less* than $150,000 and $75,000, respectively. In that event, the portion of those creditors' claims representing the difference between the fixed pay-out and the (lesser) actual value of the collateral would have been repaid dollar for dollar, notwithstanding the unsecured status of that portion of the claims. As the bankruptcy court correctly noted, "[t]his alone is objectionable[;] since these amounts are subject to change and since unsecured creditors are not paid in full, the value of those claims must be determined under 11 U.S.C. § 506." *Id.* at 2-3. Section 506 requires the value of the collateral to be calculated "in light of the purpose of the valuation and of

Legend Radio Group, Inc. v. Sutherland, 211 F.3d 1265 (2000)

     the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting [the secured] creditor's interest." 11 U.S.C. § 506(a). The statute thus contemplates that the valuation issue will, in most cases, be subjected to the adversary process, with the ultimate determination made by the court.

3    *See* 11 U.S.C. § 1129(b)(2)(B)(ii) (requirement that plan be "fair and equitable" presupposes that "the holder of any claim or interest that is junior to the claims of such class [of unsecured claims] will not receive or retain under the plan on account of such junior claim or interest any property"); *In re Bryson Properties, XVIII,* 961 F.2d 496, 503 (4th Cir.1992) ("The absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a reorganization plan."), *quoting in part Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202 (1988) (internal quotation marks, brackets, and citations omitted). Southern and Premier, holding unsecured claims against the estate, each voted against the Legend Plan.

4    Section 1127(a), in contrast, addresses pre-confirmation modifications to proposed plans, which can only be made by the plan's proponent.

5    *See In re Best Products Co., Inc.,* 177 B.R. 791, 802 (S.D.N.Y.) (noting that after a confirmed plan has been substantially consummated, "[t]he court cannot adopt any modification that materially alters the plan and adversely affects a claimant's treatment") (citations omitted), *aff'd,* 68 F.3d 26 (2d Cir.1995).

6    Section 222 provided, in pertinent part, that "[a] plan may be altered or modified, with the approval of the judge, after its submission for acceptance and before or after its confirmation if, in the opinion of the judge, the alteration or modification does not materially and adversely affect the interests of creditors or stockholders." 11 U.S.C. § 622 (repealed 1978). Section 229(c) imposed the additional prerequisite that a plan could not be modified if it had been substantially consummated. 11 U.S.C. § 629(c) (repealed 1978); *see Inland Gas,* 275 F.2d at 517 (Miller, J., dissenting).

---

**End of Document**                   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

CERTIFICATE OF SERVICE

I hereby certify that the foregoing **OBJECTION BY APEX BANK TO MOTION TO MODIFY PLAN** was filed electronically in accordance with the local rules and was therefore served electronically on the entities that have properly registered for such electronic service by CM/ECF or by mailing a copy of same by first-class postage prepaid mail as noted as follows:

Served by CM/ECF:

Samantha K. Brumbaugh
Ivey, McClellan, Gatton & Siegmund, LLC
PO Box 3324
Greensboro, NC 27402

William Miller
US Bankruptcy Administrator
101 South Edgeworth Street
Greensboro, NC 27401

Phillip Sasser
Sasser Law Firm
2000 Regency Parkway, Suite 230
Cary, NC 27518

This the 17th day of May, 2019.

/s/ Daniel C. Bruton
DANIEL C. BRUTON